AVERY & SON v. WILSON.

1. EVIDENCE—CASE—EXCEPTION.—An objection to the ruling of a Circuit Judge in refusing to admit in evidence a judgment roll, cannot be considered by this Court, unless the roll is incorporated in the "Case."

2. PLEADING—ANSWER—MOTION.—A motion for leave to file a supplemental answer cannot be granted without four days notice to opposite side.

3. EXCEPTIONS too general for consideration.

4. FINDINGS OF FACT by Circuit Judge as to Westcoat mortgage affirmed.

5. CHANGE OF RESIDENCE.—To effect a change of residence, there must be, 1st, an *intention* to make such change; 2d, the intention must be *actually* carried into effect.

6. A CHATTEL MORTGAGE must be recorded where the mortgagor resides, and a mortgage executed in one county, and afterwards recorded in another to which the mortgagor removed, is properly recorded.

7. FINDINGS OF FACT of Circuit Judge as to Ancrum mortgage, Bank of Rock Hill mortgages, and deed of assignment, reversed.

8. THE STATUTES OF ELIZABETH are affirmative of the common law, and the omission from said statutes, as now revised, of the words, "goods

and chattels," does not enable debtors to practice frauds as to "goods and chattels," any more than they can as to any other property.

Before TOWNSEND, J., Yorkville, January, 1896. Modified.

Action by B. F. Avery & Sons, Tabb & Jenkins Hardware Co., Wm. A. Tottle and James W. Ramsey, partners, etc., as Wm. A. Tottle & Co., The Hazzard Powder Co., Simmons Hardware Co., Standard Oil Co., and Supplee Hardware Co., against W. B. Wilson, jr., (as assignee of John Gelzer,) John Gelzer, Julius J. Wescoat, Benjamin Greig, John V. McNamee and Paul W. Sanders, partners, etc., as Marshall, Wescoat & Co., and John L. Ancrum.

The following is so much of the Circuit decree as is necessary to understand the questions involved:

From all the evidence I conclude as matter of fact:

1. That John Gelzer was a resident of Charleston County, State of South Carolina, when he gave the mortgage to J. J. Wescoat, trustee, on the 17th day of August, A. D. 1892, and had been a resident of said county of Charleston continuously for about ten years prior to the date of the execution of said mortgage. John Gelzer was insolvent when he executed this mortgage, and he knew it, and in the light of all the testimony, I am constrained to find that J. J. Wescoat was also, at the date of the execution of this mortgage, aware of John Gelzer's insolvency. The mortgage was taken in the sum of $700, when, according to the testimony of J. J. Wescoat himself, only the sum of $300 was advanced to Gelzer to enable him to buy the claim of his partner, Jenkins, in the business of Jenkins & Gelzer, and I find as a fact that the said mortgage was taken for $400 in excess of the true amount of money loaned to Gelzer. This mortgage covered the entire tangible property of John Gelzer, has never been recorded in Charleston County, and was not recorded in York County until the 10th day of January, A. D. 1894. After maturity of the mortgage, the mortgagor was allowed to retain and use the mortgaged property as his own, and thereby to deceive his creditors

into selling him goods they otherwise would not have done. The real reason for not recording the mortgage sooner, I find, was an understanding between the mortgagor and the mortgagee to that effect, in the form of a request from the mortgagor and an acquiescence on the part of the mortgagee.

2. At the date of the execution of the mortgage by John Gelzer to John L. Ancrum on the 1st day of September, 1892, Gelzer was insolvent, and a resident of Charleston, in the county of Charleston, S. C., and had been continuously prior to said date for a period of nearly ten years. The mortgage covered the entire tangible property of John Gelzer, has never been recorded in Charleston County, and was not recorded in York County until the 31st day of January, 1894. The money for which this mortgage was given was actually advanced at the time of its execution, and I am not satisfied that John L. Ancrum was then aware of the insolvency of Gelzer. He was, undoubtedly, careless and negligent about making proper inquiry into the financial condition of John Gelzer, and allowed Gelzer to induce him to agree to withhold the mortgage from record. One of the motives that induced Ancrum to enter into an agreement with Gelzer not to record the mortgage appears on the face of the mortgage itself, wherein it was provided that John Gelzer "is to continue his present business of buying, selling, and delivering goods to the purchasers thereof, provided that the sales, moneys, notes, accounts, and choses in action given in payment of said goods, shall be held by John Gelzer as trustee for the said John L. Ancrum." With this arrangement, Ancrum became careless and indifferent as to the rights of others, and by failing to record, and permitting Gelzer to remain in possession of the stock of goods and to hold them out to the world as his own, from September 1st, 1892, to January 31st, 1894, when he recorded the mortgage in an improper county, shows that he felt no concern about having enabled Gelzer to deceive the plaintiffs into becoming his creditors.

3. On the 21st day of January, 1893, when John Gelzer

executed the mortgage in the sum of $2,000 to the Savings
Bank of Rock Hill, S. C., he possessed nothing in the world
but his stock of goods at Rock Hill.    Gelzer himself swore:
"I, had everything I possessed then in my store at Rock
Hill."    The mortgage, as marter of fact, covered his entire
property, and was intended not only to operate as security
for such advances as the bank might make, but knowing
himself to be insolvent, John Gelzer, by means of this mort-
gage, which became due only one day after its date, intended
to prefer the savings bank, in a manner forbidden by law.
He intended to evade the assignment law of the State of
South Carolina, by the device of a mortgage, thereby hop-
ing to accomplish by this means what he could not possibly
do by a formal deed of assignment.    The officers of the
bank swear that they were not aware of Gelzer's insolvency.
They are truthful and reliable gentlemen, and I must accept
what they say as the truth, but the testimony forces me to
the conclusion that they should have known of his insol-
vency, and had reasonable cause to believe that he was in-
solvent.    There was sufficient evidence in their possession,
considering Gelzer's proximity to them and the claims they
had against him for collection through their bank, to put
them on their guard and to invoke inquiry, which would
have disclosed to them Gelzer's insolvency.    There are also
additional circumstances surrounding this mortgage which
should have sounded the alarm in the ears of the officers of
the bank; the mortgage matured in one day—that is, the
bank was put in a position to step in at once and seize the
mortgaged property, if a crash came in Gelzer's affairs.    The
mortgage was withheld from record for nearly one year, and
in the meantime Gelzer was suffered to use the mortgaged
goods as his own, and by holding them out to the world as
his unencumbered property, to obtain credit upon them,
and to deceive and defraud each of the plaintiffs to this
action into becoming his creditors, which they would not
have otherwise done.    Gelzer requested the officers of the
bank not to record the mortgage; he particularly desired it

6—47

to be withheld from record, because he desired to hold out to the world that the goods were his own, free of encumbrance, and thereby get credit from others who would know nothing of the mortgage. The bank acquiesced in this, and thereby enabled Gelzer to deceive and defraud the plaintiffs and his other unsecured creditors to the aggregate amount of $9,000. Another significant act on the part of the bank was the conduct of its cashier, Mr. J. M. Cherry, on the 5th day of January, 1894. On the 2d day of January, 1894, one of the plaintiffs wrote to the cashier, inquiring into the financial condition, responsibility, and character of John Gelzer; on the 5th day of said month and year, the cashier replied to said letter: "Mr. G. is an energetic, live young business man; has a very nice hardware store, and has been doing a very nice business, considering the times. On account of the dull trade he is asking indulgence on some of his paper at present." On the very day that the bank rendered this report of John Gelzer, in which the mortgaged indebtedness to the bank was studiously suppressed, the bank caused the two mortgages executed by Gelzer to the bank, aggregating the sum of $5,100, to be recorded in the office of the register of mesne conveyance for York County. Even at this late date the bank was willing to allow Gelzer to still hold himself out to the world as the owner of the stock of goods in his possession, and to obtain further credit on the strength of such appearances. Knowing, however, that the inquiring creditor would, no doubt, act upon his report, the cashier deemed it prudent to record the mortgages he was careful not to mention in his report of the condition of Gelzer. That secrecy, deep and profound, was the object of both the bank and John Gelzer, when both of the mortgages by Gelzer to the bank were executed, is apparent from the fact that, although J. M. Cherry represented the bank on both occasions, and was the officer to whom the mortgage when signed and sealed was delivered, he was also the sole and only subscribing witness to each of said mortgages.

4. All that has been said and found concerning the mortgage to the bank dated January 21st, 1893, is of equal application to the mortgage to the said savings bank dated December 2d, 1893. All the facts found concerning the motives and the intentions of the said bank and Gelzer appear with emphasized force and clearness in this latter transaction. On the 2d day of December, A. D. 1893, when John Gelzer executed the mortgage to the Savings Bank of Rock Hill, S. C., in the sum of $3,100, ostensibly to secure notes, mostly past due, aggregating said amount, he possessed no other property but his stock of goods. This mortgage, therefore, like the previous one dated January 21st, 1893, covered the entire property of John Gelzer. John Gelzer being insolvent from some time before the 17th day of August, 1892, had become hopelessly insolvent on the 2d day of December, 1893, and clearly saw that there was no hope for him, although, by means of representations made in his letters to his creditors, written shortly before and about this time, he had induced them to accept his worthless notes in settlement of their claims, and thus, for a time, tided over the inevitable crash. All this time John Gelzer was preparing to prefer the bank in some manner that he hoped would not be obnoxious to the laws of this State. Accordingly, on the 2d day of December, 1893, he executed to the Savings Bank of Rock Hill, S. C., not a renewal mortgage, but an additional mortgage, in the sum of $3,100. Thus, while John Gelzer never did owe the bank but $3,100, he executed two mortgages, aggregating $5,100, which was $2,000 more than the true amount the bank could possibly claim. The bank retained both of the mortgages. The mortgage executed on the 2d day of December, 1893, in the sum of $3,100, was not intended as a renewal of the original mortgage in the sum of $2,000, dated the 21st day of January, 1893, but was made by Gelzer, and received by the bank, as an additional mortgage.

Next follows the two crowning acts of forbidden prefer-

ence—one by the Savings Bank of Rock Hill, S. C., and
the other by Gelzer. One, the spreading of these two mort-
gages on the records of York County for public inspection,
on the 5th day of January, 1894, with a deceptive state-
ment on their face as to the amount actually due on them;
and the other, the execution by Gelzer of the deed of as-
signment for the benefit of creditors, on the 8th day of
February, 1894, only sixty-eight days from the date of the
execution of the last mortgage, on the 2d day of December,
1893. On the 7th day of February, 1894, the day imme-
diately preceding the execution of the deed of assignment,
Gelzer made a payment to the Savings Bank of Rock Hill
in the sum of $565, which was credited on his mortgage
debt, and on the 8th day of February, 1894, the same day
on which his deed of assignment was executed, Gelzer paid
on the mortgage debt of John L. Ancrum, through Wilson
& Wilson, the latter's attorneys, the sum of $215—thus to
the very last moment endeavoring to give substance to the
preferences he intended to give said mortgagees from the
moment that each of the mortgages was executed.

5. At the time of the execution of the several mortgages
to J. J. Wescoat, trustee, John L. Ancrum, and the two
mortgages to the Savings Bank of Rock Hill, S. C., on the
17th day of August, 1892, 1st day of September, 1892, 21st
day of January, 1893, and the 2d day of December, 1893,
respectively, John Gelzer was insolvent, and each of the said
mortgagees either knew, or had good reason to know, that
he was insolvent, and each of these transactions were had
and made in pursuance of an original design and intent of
the said John Gelzer and each of the mortagees above men-
tioned, determined on by them at the inception of each
transaction, to transfer and assign all of the tangible prop-
erty of the said John Gelzer to the said mortgagees, to the
exclusion of all the other creditors of the said John Gelzer.

6. The conduct of all the mortgagees shows that they,
each and every one of them, colluded with the mortgagor;
that they used the indebtedness of John Gelzer to themselves

to draw up notes (in the instances of J. J. Wescoat, trustee, and of the savings bank, for more than the true amounts), and mortgages that were intended not as security, pure and simple, for the repayment of the money due by John Gelzer, but also for the ulterior purpose of benefiting John Gelzer, who, pursuant to the original scheme, was to continue in possession of the stock of goods after maturity; to continue to do business just as if no mortgages were in existence; to hold out the stock of goods to the world as his own property, and thereby to obtain a corresponding credit. John Gelzer, in effect, made the following proposition to each of the mortgagees: "I will give you a preference, and will assign to you all of my tangible property, provided you will allow me to have the use of it indefinitely, or until I can pay off the debt." Each of the mortgagees assented to this proposition, and did suffer Gelzer to remain in possession of the stock of merchandise, which constituted the whole of his tangible property, indefinitely, to hold out the said stock to the world as his own property, and do business at his old stand and in his own name, and for his own benefit, until a few days preceding the execution of the formal deed of assignment, on the 8th of February, 1894. The conduct of all the mortgagees, as thus shown, deceived plaintiffs, misled them, and caused them to extend credit to John Gelzer, which they would otherwise not have done.

7. At the date of the execution of the formal deed of assignment by Gelzer, on the 8th day of February, 1894, Gelzer's assets consisted of his stock of merchandise at Rock Hill, S. C., of the value, according to the estimates of experts and sworn appraisers, of $6,637, and some accounts of doubtful value, which accounts, by reason of the stipulations in the mortgage to John L. Ancrum, had to be held in trust by Gelzer for Ancrum. His total liabilities amounted to $13,500, and of this amount $4,500 represented his mortgage indebtedness to J. J. Wescoat, trustee, John L. Ancrum, and the Savings Bank of Rock Hill, leaving a balance amounting to $9,000, representing the amount of his in-

debtedness to his unsecured creditors. The notes and accounts above mentioned were estimated by Gelzer to be worth from $700 to $1,000; but the assignee had failed to realize on them, when he testified in November; and I find that said accounts are not worth the estimate placed upon them by Gelzer, and are of doubtful value.

As a matter of law, I find: That the mortgages executed by John Gelzer to J. J. Wescoat, trustee, on the 17th day of August, 1892, and a mortgage executed by him to John L. Ancrum on the first day of September, 1892, in the sum of $1,500, having each been made and delivered while John Gelzer was a resident of Charleston County, in· this State, and having never been recorded in said county of Charleston, as required by law, each of said mortgages are, as to the plaintiffs in this action and all other subsequent credittor and purchasers without notice, null and void, and of none effect. Gen. Statutes S. C. (1882), secs. 1776 and 2346; Gen. Statutes S. C. (1893), sec. 1968; *Gregory* v. *Ducker*, 31 S. C., 141; *London* v. *Youmans*, *Idem*, 141.

It was contended before me by the defendants that the plaintiff, the Tabb & Jenkins Hardware Company, were affected with notice of these two mortgages, and the affidavit of Charles T. Jenkins, representative of said company, and the deposition of said Jenkins made in this cause, were relied upon as furnishing the proof. I have critically examined both papers, and find both barren of any evidence of notice to take the place of registration. Such notice must be full, explicit, and clearly proven. *City Council* v. *Page*, Speer Eq., 211–212; *London* v. *Youmans*, 31 S. C., 151.

The communications of Gelzer to Jenkins, the representative of the aforesaid corporation, furnished ample grounds for basing an attachment upon Gelzer's stock of merchandise, as the Supreme Court of this State has held. *Tabb & Jenkins Hardware Co.* v. *John Gelzer*, 21st S. E. Reporter, 261. But they are lacking in every essential to constitute such notice as would take the place of registration of the mortgages in the proper county. Each of the said

mortgages are clearly obnoxious to the Statutes of Elizabeth; both of them, by force of the stipulations in them contained, became after maturity bills of sale at the option of the mortgagees.    After the conditions were broken, each of the mortgagees were empowered to take the stock of merchandise into their respective possession, as his own proper goods and chattels and for his own benefit, henceforth and forever.   Nevertheless, the mortgagor was suffered by each of said mortgagees to remain in possession of the mortgaged chattels (the stock of merchandise) for considerably more than one year, holding out the stock to the world as his own property.

The invalidity of the mortgages was dependent upon the fact whether the retention of possession of the stock of merchandise, after breach of condition, was for the benefit of the mortgagor, or the price of preference given to the mortgagees.    Having found as a matter of fact that the mortgages were executed not as security, pure and simple, but for the ulterior purpose of benefiting John Gelzer, they are, as to the plaintiffs in this action, null and void.   *Pregnall & Bro.* v. *Miller & Kelley*, 21 S. C., 391; *Younger* v. *Massey*, 39 S. C., 119–121; *Smith* v. *Henry*, 1 Hill, 16; *Gist* v. *Pressley*, 2 Hill's Ch., 328; *Maples* v. *Maples*, Rice's Ch., 310; *Bank* v. *Gourdin*, Speer's Eq., 439; *Lowry* v. *Pinson*, 2 Bailey, 328.

As an additional ground why the Statute of Elizabeth is fatal to the mortgage executed to J. J. Wescoat, trustee, it must be borne in mind that this mortgage was taken for $400 in excess of the true amount of money loaned to Gelzer by Wescoat.    For this reason, if for no other, its lien cannot be preserved, even for the true amount of money loaned.   *Bowie* v. *Free*, 3 Rich. Eq., 403; *Dickinson* v. *Way,* *Id.*, 413; *Hipp* v. *Sawyer*, Rich. Eq. cases, 410; *Younger* v. *Massey*, 39 S. C., 120; *Lowry* v. *Pinson*, 2 Bailey, 328.

The mortgage executed to John L. Ancrum was also further obnoxious to the Statute of Elizabeth in that it stipulated that all sales of the stock of merchandise, or any

part thereof, all moneys, notes, choses in action, taken from purchasers in payment thereof, should be held by John Gelzer in trust for John L. Ancrum. Considering this stipulation, method appears in John L. Ancrum's apparent madness and recklessness. John L. Ancrum actually agreed with Gelzer not to place his mortgage on record. The reason is now evident. As long as the plaintiffs and other unsecured creditors supplied Gelzer with goods to keep up the stock of merchandise, John L. Ancrum, under the stipulations in his mortgage, became a direct beneficiary of the fraud of Gelzer, as all the proceeds of sales had to be held by Gelzer in trust for Ancrum. *Means* v. *Dowd*, 128 U. S., 273; *Robinson* v. *Elliott*, 32 Wall., 524.

Each of the mortgages executed by John Gelzer to the Savings Bank of Rock Hill, dated January 21st, 1893, and December 2d, 1893, respectively, are null and void under the Statute of Elizabeth. Each of them were executed not only to secure the amount of money that Gelzer was indebted to the bank, but also with the ulterior purpose of benefiting Gelzer himself. For this purpose, and with a view to screening Gelzer from his creditors, the savings bank took mortgages aggregating $5,100, whereas John Gelzer never did owe the bank but $3,100, and spread these mortgages with the deceptive statement of the amount secured on the records of York County. *Lowry* v. *Pinson*, 2 Bailey, 328; *Bowie* v. *Free*, 3 Rich. Eq., 328; *Younger* v. *Massey*, 39 S. C., 120. The mortgages having been executed for $2,000 in excess of the true amount in which John Gelzer was indebted to the bank, were not only intended to secure the amounts actually advanced, but also to enable John Gelzer to defeat, delay, hinder, and defraud his creditors. They are, therefore, null and void as to the plaintiffs, and will not be allowed to retain their lien even for the amount of money actually loaned by the bank to Gelzer. All of the mortgages complained of by the plaintiffs in their complaint, namely, the mortgage to J. J. Wescoat, trustee, dated August 17th, 1892, the mort-

gage to John L. Ancrum, dated September 1st, 1892, mort-gage to Savings Bank of Rock Hill, dated January 21st, 1893, and the mortgage to the Savings Bank of Rock Hill, dated December 2d, 1893, are null and void under the as-signment act of the State. They each cover all the tangi-ble property that John Gelzer possessed at their respective dates, and, considered *seriatim*, each one in itself operates as an assignment with preferences. The mortgages are mere evasions of the law of a formal deed of assignment under the assignment act, and seek to accomplish what could not be done through the instrumentality of a formal deed of assignment. The object of the assignment act was to cut off preferences, root and branch, to prevent an insolvent debtor from transferring or assigning his property for the benefit of one or more of his creditors to the exclusion of all others, and whether this object is sought to be effected by a formal deed of assignment or in any other mode, can make no difference. "Any other view, it seems to us, would sacrifice substance to mere form, and enable insolvent debt-ors, by evasion, to effect a purpose declared by statute to be unlawful." *Wilks* v. *Walker*, 22 S. C., 111; *Austin* v. *Morris*, 23 S. C., 393. It is immaterial whether one in-strument or several was used by the insolvent debtor as the means of transferring the whole of his tangible property to one or more of his creditors, to the exclusion of all others. *Mann* v. *Poole*, 40 S. C., 1; *Mitchell* v. *Mitchell*, 42 S. C., 475; *Meinhard* v. *Youngblood*, 41 S. C., 312; *Putney* v. *Friesleben*, 32 S. C., 496; *Austin* v. *Morris*, 23 S. C., 393; *Wilks* v. *Walker*, 22 S. C., 111.

The mortgage executed by John Gelzer to the Savings Bank of Rock Hill, S. C., on the 2d day of December, 1893, only sixty-eight days in advance of the execution by him of his formal deed of assignment to W. B. Wilson, jr., on the 8th day of February, 1894, was a part of the original scheme to prefer the bank, and to transfer to it all the tangible property of Gelzer, to the exclusion of his other creditors. It must be construed together with the formal

deed of assignment, and, so construed, constitutes a deed
of assignment with preferences, forbidden by law. *Mann*
v. *Poole*, 40 S. C., 1; *Mitchell* v. *Mitchell*, 42 S. C., 475;
*Putney* v. *Friesleben*, 32 S. C., 496; *White* v. *Cotzhazen*,
129 U. S., 330. The invalidity of an assignment, such as
is contemplated by the assignment act, does not depend
upon the fact whether or not the preferred creditor has
knowledge of the fraudulent intention of the debtor. The
statute denounces the preference, and declares the assign-
ment inoperative, and that is its character, regardless of
the *bona* or *mala fides* of the preferred creditor. *Austin* v.
*Morris*, 23 S. C., 401; *Putney* v. *Friesleben*, 32 S. C., 494.

The several plaintiffs in this action being the only cred-
itors of John Gelzer who, at the date of the commencement
of this action, had reduced their claims to judgment, and
had obtained returns of "*nulla bona*" upon the several ex-
ecutions issued to enforce each of said judgments, have, by
reason of their diligence, obtained a just and legal prefer-
ence. In fact, at the hearing of this cause before me, it
was not questioned that such would be the result, if the
plaintiffs succeeded in vacating the mortgages and the deed.
of assignment. *Ryttenberg* v. *Keels*, 39 S. C., 213–14; *Trust
Co* v. *Earle*, 110 U. S., 716–17; *McDermott* v. *Strong*, 4
Johns. Ch., 691; Pom. Rem. (2d ed.), sec. 267.

It is, therefore, ordered, adjudged, and decreed, that each
of the mortgages executed by John Gelzer to J. J. Wescoat,
trustee, John L. Ancrum, and the two mortgages executed
by him to the Savings Bank of Rock Hill, S. C., dated,
respectively, the 17th day of August, 1892, 1st day of Sep-
tember, 1892, 21st day of January, 1893, and 2d day of
December, 1893, as also the deed of assignment for the ben-
efit of creditors, executed by the said John Gelzer to the
defendant, W. B. Wilson, jr., on the 8th day of February,
1894 (all of which are specifically set forth in the complaint),
be, and they are hereby, vacated and set aside as fraudulent
and void; that Harry McCaw and William C. Gist, of the
county of York and State aforesaid, be, and they are hereby,

appointed receivers of all the property and assets of John Gelzer, of every kind and description whatsoever not exempt by law from levy and sale, with all the powers and duties, and subject to all the liabilities, of such receivers, upon their entering into bond in the usual form. * * *

From this judgment the defendants appeal on the following exceptions:

First, as to the introduction of evidence:

1. For error in allowing the judgment roll of Tabb & Jenkins Hardware Co. *v.* John Gelzer to be introduced over defendants' objection.

2. For error in excluding the judgment roll of Marshall, Wescoat & Co. *v.* E. A. Crawford, offered by the defendant; and in this connection, for error in refusing to allow the defendants leave to file their supplemental answer, pleading the said judgment.

3. For error in not excluding, and again for error in not ruling upon, certain of the testimony offered by the plaintiffs; and again for error in not admitting certain of it offered by the defendants, upon the various grounds noted at the hearing, to wit:   a. Not excluding, and not ruling upon, the testimony of the witness, Watt, as to declarations of Welling on appraisement and value.   b. Not excluding, and not ruling upon, all declarations of John Gelzer after the execution of the mortgages in issue, whether made by himself on the witness stand, or made to others by letter or word of mouth, and sought to be proved by such letters, or by other witnesses.

Second, as to findings in decree:

1. For error in finding as matter of fact in reference to each of the mortgages set aside (Marshall, Wescoat & Co., J. L. Ancrum, the Savings Bank of Rock Hill, first and second), that at the time of its execution, severally: a. John Gelzer was a resident of Charleston County; b. John Gelzer was insolvent; c. John Gelzer knew himself to be insolvent; d. Each mortgagee knew John Gelzer to be insolvent; e.

Each mortgagee had reasonable cause to believe John Gelzer insolvent; f. Each of the mortgages covered all John Gelzer's property; g. Each of the mortgages covered all John Gelzer's tangible property; h. Each mortgagee agreed with John Gelzer not to record his mortgage; i. Each mortgagee so agreed with the purpose of aiding John Gelzer to deceive his creditors; k. Each mortgage was given and taken not for security to the mortgagee simply, but for the ulterior purpose of benefiting John Gelzer, and of aiding him to hinder, delay, defraud, and deceive his creditors,' and especially the plaintiffs; l. Each mortgage was made by Gelzer with intent thereby—and also with intent in connection with his anticipated deed of assignment—to make an assignment of all his property with a preference to the mortgagee, in fraud of the assignment act; m. Each mortgagee accepted his mortgage, knowing of the intention of John Gelzer as aforesaid.

2. For error in finding as matters of fact: a. In reference to the Marshall, Wescoat & Co. mortgage, that it was taken for $400 more than was actually due, with intent to deceive his creditors; and in this connection for failing to find that the part of the mortgage in excess of $400 was made to Wescoat as trustee for another person; and for failing to find that at that time John Gelzer was not indebted to any other persons. b. In reference to the savings bank's second mortgage, that it was taken for $2,000 more than was actually due, with like intent; and in this connection, for failing to find that the savings bank's second mortgage was taken in furtherance of an agreement made at the time of the taking of the $2,000 mortgage, that an additional mortgage would be given to cover such advances as might be made beyond the $2,000, after allowing all proper credits, and as collateral security to the first mortgage; and for failing to find that the bank or its assignees ever claimed that any debt ever existed in excess of $3,100; and for failing to find that the savings bank's first mortgage was not for money then loaned, but was given as security for further advances, to aid John Gelzer in conducting his mercantile business.

3. For error of law in finding: a. That the want of record of the Marshall, Wescoat & Co. and J. L. Ancrum mortgages in Charleston County rendered each of them void as to all subsequent creditors with or without liens. b. That the facts recited in the affidavit upon which the Tabb & Jenkins attachment was issued, and in deposition of the witness, Charles T. Jenkins, were and are wholly insufficient proof of notice of the existence of the mortgages referred to therein, so as to supply the place of record. c. That each of the mortgages is void under the act of Elizabeth; and in this connection, that each mortgage shows on its face an ulterior purpose to benefit the mortgagor, as the price of the mortgagee's preference. d. And as to the John L. Ancrum mortgage, that its terms, requiring the proceeds of sale to be held in trust, made the mortgagee a conscious beneficiary of John Gelzer's fradulent purpose to deceive his creditors. e. That each of the mortgages is void under the assignment act, as a disposition of all the mortgagor's property with preference to the mortgage creditors; and, in this connection, that it is immaterial whether the mortgagee knew that such was his intention. f. That the savings bank's second mortgage was void, because made within ninety days of the deed of assignment. g. That because the Marshall, Wescoat & Co. and the savings bank's second mortgage were taken—each of them—for more than due, neither of them could stand as security for the real amount due.

4. For error of law and fact in each of the findings made in the following language: "At the time of the execution of the several mortgages to J. J. Wescoat, trustee, John L. Ancrum, and the two mortgages to the Savings Bank of Rock Hill, S. C., on the 17th day of August, 1892, 1st day of September, 1892, 21st day of January, 1893, and the 2d day of December, 1893, respectively, John Gelzer was insolvent, and each of the said mortgagees either knew, or had good reason to know, that he was insolvent, and each of these transactions was had and made in pursuance of an

original design and intent of the said John Gelzer and each
of the mortgagees above mentioned, determined on by them
at the inception of each transaction, to transfer and assign
all of the tangible property of the said John Gelzer to the
said mortgagees, to the exclusion of all the other creditors
of the said John Gelzer.   The conduct of all the mortga-
gees shows that they, each and every one of them, colluded
with the mortgagor; that they used the indebtedness of
John Gelzer to themselves, to draw up notes (in the in-
stances of J. J. Wescoat, trustee, and of the savings bank
for more than the true amounts) and mortgages that were
intended not as security, pure and simple, for the repay-
ment of the money due' by John Gelzer, but also for the
ulterior purpose of benefiting John Gelzer, who, pursuant
to the original scheme, was to continue in possession of the
stock of goods, after maturity, to continue to do business
just as if no mortgages were in existence, to hold out the
stock of goods to the world as his own property, and there-
by to obtain a corresponding credit.   John Gelzer, in effect,
made the following proposition to each of the mortgagees:
I will give you a preference, and will assign to you all of
my tangible property, provided you will allow me to have
the use of it, indefinitely or until I can pay off the debt.
Each of the mortgagees assented to this proposition, and
did suffer Gelzer to remain in possession of the stock of
merchandise, which constituted the whole of his tangible
property, indefinitely, to hold out the said stock to the
world as his own property, and to do business at his old
stand, and in his own name, and for his own benefit, until a
few days preceding the execution of the formal deed of as-
signment on the 8th of February, 1894.   The conduct of
all the mortgagees as thus shown, deceived plaintiffs, mis-
led them, and caused them to extend credit to John Gelzer,
which they would otherwise not have done."

5. Error in requiring each of the mortgagees to account
for the goods at their *ex parte* appraised value.

6. For error of law and fact in holding that John Gelzer

made his deed of assignment with intent to hinder, delay, and defraud his creditors.

*Mr. Jas. F. Hart*, for appellant, cites: *Fraud:* 22 S. E. R., 792; Speer's Eq., 311; 112 N. C., 180; 36 W. Va., 391; 80 Ga., 247; 88 Va., 980; 33 Hun., 557; 20 S. C., 431; 33 S. C., 475; 38 S. C., 462; Rice's Eq., 78; 3 Rich. Eq., 410; 27 S. C., 272; 39 S. C., 150. *Assignment:* 26 S. C., 250; 39 S. C., 150; 27 S. C., 272; 43 S. C., 456.

*Mr. W. J. Cherry*, for appellant, cites: 18 S. C.; Kirshlam v. Isreal, 1 Speer Eq., 14. *Recording:* 23 S. C., 543. *Insolvency:* 23 S. C., 394; 27 S. C., 272 and 491; 40 S. C., 1.

*Mr. Wm. B. McCaw*, contra, cites: *Evidence:* 17 S. C., 35. *Sup. Answer:* 2 Wait's Pr., 470, 471, 474; Code, 198; 16 S. C., 350; 46 N. Y., 200. *Exceptions:* 30 S. C., 167; 43 S. C., 99; 42 S. C., 281; 24 S. E. R., 101. *Findings:* 41 S. C., 546, 547; 16 S. C., 633; 43 S. C., 99. *Recording:* Rev. Stat., 1776, 1968, 2346; 31 S. C., 141, 147; Sp. Eq., 1, 211, 212; 31 S. C., 150; 33 S. C., 472, 473; 23 S. C., 94; *Mortgages:* 32 S. C., 171; 2 Bail., 328. *Assignment:* 26 S. C., 446; 40 S. C., 1; 42 S. C., 475. *Exceptions:* 40 S. C., 437; 30 S. C., 167; 43 S. C., 99; 42 S. C., 281; 24 S. E. R., 101; 27 S. C., 285.

*Messrs. Finley & Brice*, contra, cite: *Recording:* 31 S. C., 147; Rev. Stat., 1968. *Fraud:* 21 S. C., 391; 1 Hill, 25; 31 S. C., 36. *Assignment:* Rev. Stat., 2146; 22 S. C., 111; 22 S. E. R., 2; 43 S. C., 342; 23 S. C., 401; 39 S. C., 120.

July 11, 1896.  The opinion of the Court was delivered by

MR. JUSTICE GARY.  The above entitled action was commenced in the Court of Common Pleas for York County on the 4th day of May, 1894, and was heard by his Honor, Judge Townsend, at the November (1895) term of said Court.  All the testimony, except that of John L. Ancrum, had been taken before his Honor, Judge Aldrich, at the November (1894) term of said Court, and

it was published before his Honor, Judge Townsend, subject to admissibility under the exceptions made before both Judges. On the 16th of January, 1896, Judge Townsend filed his decree, which, together with appellants' exceptions, will be set out in the report of the case. The respondents gave notice of additional grounds upon which they would ask that said decree be sustained, but withdrew such notice. It is admitted that the decree properly and sufficiently sets out the issues presented by the pleadings, and that it correctly states the judgment claims of the plaintiffs. Paragraph 1 of the first exception was withdrawn. The other parts of said exception will now be considered.

The first question arising under paragraph 2 of the first exception is, whether it was error on the part of the Circuit Judge, in excluding the judgment roll of Marshall, Wescoat & Co. *v.* E. A. Crawford, offered by the defendant. The following memorandum of argument appears in the "Case:" "At the conclusion of defendant's testimony, offered at the hearing before Judge Townsend, defendants closed, reserving the right to take and offer additional testimony at any time within thirty days from to-day. Plaintiffs consented to the additional testimony being taken and offered, but reserved the right to reply to such additional testimony at any time within fifteen days from the expiration of said thirty days. The above testimony offered by defendants at hearing embraced the judgment roll of Marshall, Wescoat & Co. *v.* E. A. Crawford, sheriff, to which plaintiffs objected as irrelevant; and the testimony offered by the plaintiff included the judgment roll in Tabb & Jenkins Hardware Co. *v.* John Gelzer, to which defendants objected as irrelevant. Defendants also asked for leave to file a supplemental answer, to set up the matter of title adjudicated by the judgment, as per the judgment roll in Marshall *v.* Crawford aforesaid." His Honor, in his decree, says: "As the judgment roll in Marshall, Wescoat & Co. *v.* Edward A. Crawford is a record between other parties than the parties to this action, it is deemed irrelevant, and is

ruled out, and, as a consequence, the defendants' motion made at the hearing, without previous notice for leave to file a supplemental answer, to set up the alleged matter of title adjudicated in the aforesaid case of Marshall, Wescoat & Co. *v.* Crawford, must be denied." The said judgment is not set out in the "Case," and, therefore, cannot be considered by this Court in determining its relevancy. It is incumbent on the appellants to show error on the part of the presiding Judge, which they have failed to do.

The other question arising under paragraph 2 of the first exception is, whether there was error in refusing to allow the defendants leave to file their supplemental answer. Section 198 of the Code provides that a defendant may be allowed, *on motion*, to make a supplemental answer. Before making such motion, the defendants were required to give four days' notice thereof to the opposite party, which was not done in this case. Failure to give the proper notice of said motion was, of itself, sufficient ground for the refusal to grant the same by the Circuit Judge. *Ex parte Apeler*, 35 S. C., 421; *Wagener v. Booker*, 31 S. C., 377; *Delany v. Elford*, 22 S. C., 304.

Paragraph 3 of the first section, embracing subdivisions a and b, is too general for consideration by this Court. *Floyd v. Floyd*, 46 S. C., 184; *Sims v. Jones*, 43 S. C., 99; *Adler v. Cloud*, 42 S. C., 281; *Talbott & Son v. Padgett*, 30 S. C., 167.

The other exceptions principally complain of error on the part of the Circuit Judge in his findings of fact. Instead of considering them *seriatim*, this Court thinks it best to make a connected statement of the facts established by the testimony as follows: John Gelzer, in August, 1892, bought the interest of Jenkins, his partner, in the hardware business at Rock Hill, S. C. He did not have on hand money sufficient to complete the arrangement with Jenkins, and borrowed from J. J. Wescoat, of the firm of Marshall, Wescoat & Co., with which firm and its predecessor Gelzer had for years been employed as book-keeper.

7—47

In order to secure the payment of this sum, John Gelzer, on the 17th day of August, 1892, executed a note in the sum of $700, payable forty days after date, also a mortgage on his stock of goods at Rock Hill, S. C., to J. J. Wescoat, trustee. The evidence fails to satisfy us that more than the sum of $300 was advanced under said mortgage; and, as more than the amount advanced under said mortgage has been paid towards its extinguishment, the facts connected with it will be eliminated from the further consideration of the case, except in so far as they may throw light upon the other questions involved.

On the 1st day of September, 1892, John Gelzer executed a mortgage on his stock of goods at Rock Hill, S. C., to John L. Ancrum, to secure a bond or obligation of even date with said mortgage, and payable one year after date. At the time this mortgage was executed Gelzer was insolvent, and a resident of Charleston County, but was then contemplating a change of residence to Rock Hill, S. C. On the 20th of September, 1892, he made an actual change of domicil to Rock Hill, S. C. Two things are necessary to effect a change of residence: 1st, there must be an *intention* to make such a change; and 2d, the intention must be carried into effect by an *actual* change of domicil. John Gelzer, therefore, became a resident of Rock Hill, S. C., on the 20th of September, 1892, the said mortgage was recorded in York County, on the 31st of January, 1894. It is contended that this was not the proper county. Section 1968 of the Revised Statutes provides that: "All mortgages and instruments in writing in the nature of a mortgage, of any property real or personal, * * * shall be valid so as to effect, from the time of such delivery or execution, the rights of subsequent creditors or purchasers for valuable consideration without notice, only when recorded, within forty days from the time of such delivery or execution, in the office of register of mesne conveyance of the county where the property affected thereby is situated, in the case of real estate; and in the case of personal prop-

erty, of the county where the owner of said property resides, if he resides within the State; or if he resides without the State, of the county where such personal property is situated at the time of the delivery or execution of said deeds or instruments: *Provided, nevertheless,* That the above mentioned deeds or instruments in writing, if recorded subsequent to the expiration of said period of forty days, shall be valid to affect the rights of subsequent creditors and purchasers for valuable consideration without notice, only from the date of such record." The intention of this section is that a mortgage of personal property shall be recorded in the county within which the mortgagor resides. While John Gelzer was a resident of Charleston County, there is where the mortgage should have been recorded; but when he became a resident of Rock Hill, then York County was where it should have been recorded. John Gelzer was a resident of Rock Hill at the time the mortgage was recorded in York County, and, therefore, it was recorded within the proper county, and was notice to the public from the time of such record. As the plaintiffs had notice of this mortgage before acquiring a lien on the property therein mentioned, they do not occupy the position of subsequent creditors for valuable consideration without notice. *King* v. *Fraser*, 23 S. C., 543. The mortgage executed to John L. Ancrum was for money actually advanced at the time or its execution. The delay in recording said mortgage was not caused by an intention to aid Gelzer in any respect to hinder, delay or defeat his creditors. In short, the testimony of Dr. John L. Ancrum explains to our satisfaction every circumstance urged against the validity of his mortgage. At the time the first mortgage to the Savings Bank of Rock Hill was executed (21st January, 1893), and at the time of the agreement to execute a mortgage to secure such further advances as the bank might make Gelzer (29th June, 1893), the said bank thought Gelzer was solvent.

The agreement to give the mortgage created a lien on

the property to be mortgaged, and when the mortgage was executed in pursuance of such agreement, it had relation back to the time of the agreement. *Dow* v. *Ker*, Sp. Eq., 413; Jones on Liens, section 77; Pom. Eq. Jur., vol. III., section 1235. We are satisfied that it was not the intention of the Bank of Rock Hill to aid Gelzer in delaying, hindering or defeating his creditors in any manner. The Circuit Judge, in his decree, speaks of the officers of the bank as reliable and truthful gentlemen, and accepts what they say as the truth. The validity of said mortgages is to be determined by the facts and circumstances surrounding the execution of the first mortgage and the agreement to give the second mortgage, rather than by what took place thereafter. The assignment made by Gelzer for the benefit of his creditors is not assailed on account of any vice apparent upon the face of the deed of assignment, nor do the facts and circumstances brought out in evidence show its invalidity.

The appellants raised the question in argument, that the statute of 13th and 27th Elizabeth, as now revised, do not apply to transfers of *personal* property, because the words "goods and chattels" have been left out of the statutes. The views which we have hereinbefore expressed render a decision of such question immaterial in this case. The Court, however, takes this opportunity to settle a question of so great importance. The statutes of Elizabeth are but affirmations of the common law, and, therefore, the omission from said statutes of the words "goods and chattels" did not enable debtors to practice frauds as to "goods and chattels" any more than they could as to any other property. The conclusions of this Court on the foregoing questions of fact render a detailed discussion unnecessary as to other questions argued by counsel.

It is the judgment of this Court, that the judgment of the Circuit Court, in so far as it decides that the mortgage executed in favor of J. J. Wescoat, trustee, is no longer a subsisting claim, be affirmed, but that it be reversed in all

other respects, both as to the other mortgages and also as to the deed of assignment.